We'll move to our third argument of the morning. This is Appeal No. 21-3176, Nigel Noll v. Board of Regents, University of Wisconsin System. Mr. Henderson, good morning. Good morning, Your Honor. May it please the Court, I want to talk about what happens when an A student starts having D's. And the first D we're going to talk about today is a disability. Nigel Noll, my client, was an A student, a graduate student in the educational psychology program at the University of Wisconsin-Madison. He was a straight A student making satisfactory progress, according to his department, for three and a half years. At three and a half years in, he discloses his disability and asks for more time to complete his master's thesis. Exactly when that happens, three more D's start coming. The first of these is discouragement, where his advisor, who previously had supported him, now actually goes to the point of what the department chair later considered or potentially construed as harassment to discourage Noll from pursuing it, to tell him you need to go into a different field. Then, after discouragement doesn't work and he wishes to stay in the program, then we have disfavor. Now a graduate teaching assistant position Mr. Noll was under consideration for suddenly becomes no, because he's behind the very accommodation he had requested for his disability. Finally, when he continues in the program, he's dismissed, ultimately in a vote of the faculty in July of 2018. And that faculty vote, what precedes that, is months of escalating disfavor, escalating discouragement, where he is subject to a variety of sanctions within the department, ultimately all linking back to his disability and his request for more time. Now the district court. When you say request for more time, he asked at one point along the way, did he not for, he either asked for or received a couple of additional weeks to get some of his work done? On his master's thesis, yes, your honor. Right. Okay. Were there other requests for accommodation owing to the disability at any point in the fact pattern? Not in the fact pattern, Judge. There had been some previous things unrelated having to do with essentially student housing, but otherwise not within really the record of the case. Nothing connected to the disability. I'm sorry, Judge. Nothing connected to the disability. Those were, they just weren't connected to the ultimate dismissal, or we don't think they were. Right. So the accommodation that he did request because of the disability, he received. That's correct, Judge. He received the accommodation initially of more time. The problem became when then suddenly that granting of more time is used by the department to take adverse action against him, and that adverse action escalates. It starts, as I said, with discouragement, then ultimately when that doesn't work, essentially removes him from consideration for a TA position. How is the failure to get the TA position an adverse action when he was offered another one in the psych department? Well, Judge, first of all, and my apologies, this is kind of one of those where I try to put myself in the shoes of those within academic departments where distinctions that for me or for the court may not be, seem huge between different departments or programs of study within a department actually are very big deals. But he was told by his advisor that getting a TA position in another department would carry the same weight. He was. And he got that. So how could not getting the one be an adverse action? Well, Judge, a couple of reasons. One is because the one he was under consideration for was within his program of study. In other words, it builds on what he has already done. But the evidence, it seemed undisputed that it didn't matter. If he got it in another department, that would carry equal weight. Can you tell me weight to whom? I'm not sure I understand the court's question. Well, that his having a TA spot, it didn't matter if it was in his own department or if it was in the psych department. It was equivalent for purposes of the PhD program. I think if I understand the court's question and I would agree that there's nothing about taking a different TA position that would inherently damage his resume or damage him in the minds of others in the PhD program. So how is it adverse that he didn't get one but he got another? Well, Judge, because it was a matter of personal choice. You know, this is the one he sought. And ultimately, he was withdrawn essentially from consideration for that. It's important to remember, Your Honor, I think it's, I want to cover it now because it's something that the district court, I think perhaps this led to some of the error here in looking at our discrimination claims as these individual things and saying, well, this alone over here is discrimination. What we're talking about and really have from docket number one here, the complaint is an escalating pattern. It's something that starts as a midpoint, ultimately has a conclusion. It's not a matter of saying here's this one thing and it's in a vacuum. You know, part of why we actually bring up the TA position, and this is my point in saying this, is not just to say we think that alone is discrimination, but to say we see it as supporting or corroborating the pattern, right? Because before it, we already have discouragement. Then we have a change where now he's withdrawn from consideration. Ultimately, then we head towards dismissal. And what is significant, I think, in terms of the TA position in particular is because his advisor, Dr. Latch, specifically says it's because you're behind now. It's because you've taken more time. And that's a theme that's been repeated. Yeah, but that, but, okay, but I don't think she was saying because you just took a two-week leave, right, I'm not supporting you for the TA position. That, it's not that. It's that you are, you're still working on your thesis, I believe, and you're in year three. And we, the program, we would have liked to see you get that done before now. In other words, it's not as direct or as connected to the disability as you may be suggesting. And Judge, to your point, yeah, we're not just talking about the two weeks. I think that's the court's point, and I agree totally. But one of the complex factors in this case, in the record, is that you've got this request over here for accommodation on the thesis, and then it's part of bigger delays, right? You've got a bigger period of time. And so I think the question is, does it link back to the discrimination? And a jury could reasonably conclude that it does. Could that be the only inference? What's the adverse action, then? If you said that the not getting the TA position wasn't the adverse action, you need an adverse action to infer discrimination under the McDonnell-Douglas burden shifting. What's the adverse action? Well, Judge, the culminating adverse action, I use the word culminating because we're talking about a series of events. We're not talking about one date, one decision, where suddenly there's adverse action, and then there isn't. The culminating adverse action is Noel's dismissal from the program, and that occurred ultimately, I think I may have misstated July. I think it's actually June of 2018. That's the culminating event, and I don't know that there's a more textbook version of adverse action. Prior to his disclosure of disability, in fact, even just prior to his thesis defense, even a professor on his committee, Dr. Rosengren, talked about a reading group in the fall. You know, his conversations with people in his department all presuppose you're going to be here in the fall as a PhD student, and then after the disability, after the request for more time, after the discouragement doesn't work, the disfavor doesn't work, then a series of events that we cover in more detail in the briefing ultimately place him in a position where he's dismissed. It's not just here's one vote, and it suddenly happens. Okay. When you get to that ultimate faculty vote, there were, help me out on the numbers, were there like 13, 12 or 13 people that voted? I believe that's about correct, Judge. 12 sticks in my mind. I may have that slightly off. Yeah. Yeah. But there were only, and Dr. Blatch did not vote. She abstained, right? It depends on which piece of evidence you look at. There are two pieces of evidence there. One is her testimony is I abstained. The departmental, the actual minutes from that meeting do not record an abstention. They don't record a vote, her voting though, do they? They simply record that there were 12 no votes, and the one yes vote was, I've recorded, I forget if it's in the same document or later in a declaration, but by Dr. Enright, who was brought in to be sort of a temporary advisor figure. Yeah. What I was going to ask you about is there's of course no mention of his disability in the colloquy that precedes the call for the vote, right? There's a question that's asked. She answers the question, but at no point. So your theory strikes me as it's akin to what we'll sometimes see in employment cases under this so-called cat's paw theory. You know what I'm talking about? I do, Judge. Is that a fair observation or not? It is, Judge. So why is Blatch, why does the evidence support a conclusion that she was acting, that we have cat's paw going on here? In other words, you have to, don't you have to argue that that vote is tainted? It's tainted by disability. Okay. How, as an evidentiary matter? Well, a couple of things here, Judge. So first, you're exactly correct that nobody mentions the disability. And this is rather an unusual or counterintuitive application. And the reason is one of the big problems is precisely because nobody mentions the disability. But they do talk about, or rather Blatch talks about the impact of the disability. What does that disability mean? Well, it means he takes more time. That's null, takes more time to complete things. But the way Blatch talks about it is simply the idea that this has been a problem from the beginning. He doesn't meet deadlines. Essentially, the inference or implication, I think being very fairly the idea that he is lazy or lacks diligence as a student, or otherwise lacks ability to meet the deadlines. That's what taints the vote. What evidence is there, even if that's true, what evidence is there that she thought his disability impacted his ability to get things done on time, other than he requested a two-week extension. But there's no evidence that he ever conveyed to her that his disability caused delay, or that he needed extra time for his disability, other than this one two-week stint, which he got. Well, Judge, and that's what I would point to is that what we're talking about is initial disclosure of disability that happens in, I believe, February of 2018. But then the conversation, the scheduling of the master's thesis and completion, this is something ongoing through ultimately about May and June of that year. And so while that is initially disclosed that the disability, the evidence is there to allow a jury to reasonably infer the connection back. Are you sure that Dr. Blatch even knew the nature of the disability? I actually don't know, or rather I shouldn't say I don't know. I think the record is silent, or maybe in dispute on exactly what she knew when. Didn't your client, your client made some reference in substance to, I need a couple of weeks, I'm getting my medications under control. That's correct, Judge. That could have been for chronic back pain. And Judge, that's just it, is I don't. Which would have no, in other words, it's hard to, it's hard to see how he's carried his evidentiary burden of connecting a disability to any desire by Dr. Blatch or anybody else to kind of flush him out of the program. Well, he's carried that burden, Judge, or at least sufficient for summary judgment, and that's important here, that it's summary judgment. But he's carried that burden through a variety of ways. I mean, the timing itself is huge, the about face. Not just that suddenly we have someone saying, we don't think you're making progress now, but now we're changing the story about what happened before. We had three and a half years where, according to contemporaneous reviews in the department, he's doing fine. He's making satisfactory progress. And then post hoc, Dr. Blatch says, oh, in fact, you know, you weren't this whole time. That's one of the many pieces of evidence from which a jury could reasonably conclude that that post hoc justification is not legitimate. I do see that I'm going into my rebuttal time. So if I could reserve the rest of rebuttal,  at this time, they'd prefer. Very well. Thank you, Judge. Mr. Kilpatrick, good morning. Good morning, Your Honor. May it please the court. Plaintiffs in this circuit know very well that summary judgment is the put up or shut up time in litigation. Here, the board moved for summary judgment on Knowles' disability discrimination and retaliation claims and produced evidence in support. The board articulated legitimate, non-discriminatory, non-retaliatory reasons for adverse actions that Knowles complained of. The Department of Education Psychology's decision not to grant him a TA position for the 2018-19 academic year. And the department faculty's 12-1 vote to deny him continuation in the PhD program. Never before had there been an argument of a cat's paw theory or an escalating pattern of discrimination claim. Now, was the TA position from your standpoint, have you worked the case throughout? No, I haven't. Okay, well, you know the record. Yes. Was the TA position a freestanding discrimination claim? I had it in my mind that it was, but am I wrong about that? Yes, it was. Below, the board did not, the board conceded that denial of the TA position for that academic year was an adverse action, but it decided it. But he brought it as a freestanding claim. Right? That he wanted to recover on, in addition, of course, to ultimately being discharged from the program. Yes, that's correct. There was also a claim that Dr. Block, I believe it's Block, withdrew as his advisor. And that claim was abandoned on appeal. On appeal, the opening brief, the board just seized two arguments, that the TA position was denied and the 12-1 faculty vote. This is going to sound maybe ridiculously detailed, but was he even denied the TA position or was he put on a wait list? He was denied a TA position in the department. In his, okay. Yes, in that department. And he got a TA position in the psychology department. In the other unit, yeah. Right. He was denied in the educational psychology department. Okay. But again, the board. And based on what the argument today, this escalating pattern leading up to the vote, denying him the position, it seemed like the only issue that is preserved below is a retaliation claim based on that, not a discrimination claim. That's correct. That's how the board read the first brief. That's how the district court interpreted the plaintiff's claim was that the 12-1 vote denying him access to the PhD program was retaliation. And that can be resolved very easily. There is no evidence in the record that any of the voting faculty members had any knowledge that Mr. Knoll had complained about disability discrimination. So the district court was correct that he could not show causation for this retaliation claim. And that is undisputed in the record that there was no knowledge by any of those members that he had complained about discrimination. And there's nothing that Dr. Brown, was that the department chair? Yes. Okay. There's nothing that Dr. Brown polluted the vote either. That's correct. Dr. Brown testified in his declaration that when he had met individually with some of the faculty members during his investigation that he did not disclose that Mr. Knoll had a disability and did not disclose that he had complained about disability discrimination. And there was nothing in any of the briefs about Dr. Knoll, I'm sorry, Dr. Brown or Dr. Vlock infecting any of the other voting members at that faculty meeting. So even if we talked about a retaliation claim can be easily resolved without knowledge of complaints about disability discrimination. It can also be easily resolved if the court were to consider a disability discrimination claim for the adverse action of the 12-1 vote because there's also no knowledge that Mr. Knoll was disabled, at least other than two members of that faculty vote, Dr. Brown and Dr. Vlock. And Dr. Vlock abstained. What impact should it have that the minutes don't reflect her abstaining from the vote? I'm sorry, could you repeat that? What impact should it have that the minutes don't reflect her abstaining from the vote? I would think not. She testified in a declaration that she abstained from the vote. The minutes showed that there were, I believe, at least 15 people, faculty members at that meeting and the vote did not record who voted how, but it did record that there were 12 against and only one for. It did not show that she had abstained. It didn't show that anybody had abstained. She testified in her declaration that she had abstained from voting. She also had, upon request at that meeting, answered questions about Mr. Knoll's progress. She had stated that he had been behind and that is true. Again, if looking at it from a discrimination standpoint, these are some legitimate, non-retaliatory, non-discriminatory reasons. He was behind in his progress, over a year behind in defending his master's thesis. So at the time that he had disclosed his disability in February 2018, he had already missed the goal of Dr. Brown that he defend his master's thesis in spring, summer 2017 and missed his own goal of defending his thesis in the summer or August of 2017. So he had been behind already at that point. There was no abrupt shift as opposing counsel had said. And when you say disclosed disability, that's just shorthand for I need a couple of weeks. I'm working on getting my medicines under control. Right. He had disclosed. I should make that clear. He had disclosed that he had a disability but he had never stated what that disability was. He simply made reference to a McBurney Visa which is shorthand for he is a student at the University of Wisconsin-Madison in that program that has some type of a disability. He made reference to medication and that was it. And requested an extra two weeks to finish his thesis. That was granted. At the faculty meeting when Dr. Block made reference to him being behind, she did not make reference to a specific two-week extension of him writing his master's thesis. Is there any evidence in the record that Dr. Block knew of his disability, knew what it was at any point in time? No, there is nothing. And in Dr. Brown's declaration, he testified that he still doesn't know or still didn't know at the time of the declaration what that disability was. So for opposing counsel to say that the reason was it was because they're using the accommodation as a reason not to allow him to continue into the PhD program. That's just not true. Also, my opponent said that all faculty presumed that he would be in the PhD program in the fall. There's nothing in the record evidentiary to show that that was true either. There may be one instance where Dr. Rosengren had asked him, Mr. Knoll, to be part of a reading group in the fall. Dr. Rosengren is not even in the department. He's in the psychology department. And that could be the only thing that could be inferred that someone thought he was going to be in the PhD program. But there's nothing else. One other thing that my opponent said was that there was harassment. And that Dr. Brown had somehow admitted that there was harassment. That's not the case either, Your Honors. Dr. Brown had met with Mr. Knoll. He had said that he could understand how it could be interpreted that Dr. Block's statements that he could, Mr. Knoll, find some other type of degree could be construed as harassment. But in no case was there any admission by Dr. Brown that there was harassment going on in this case. My opponent needs to show that the legitimate, nondiscriminatory reasons for the adverse action of the TA position denial were lies. And he has not done that. He has not shown that they are phony. Everything that was provided as reasons were true. And those reasons were fourfold. Knoll was behind on his timeline for defending his master's thesis. We already got into that. Another reason was the department does not have enough TA positions for every graduate student. And he had already served as a TA twice. No evidence to show that's a lie. He had a good history of funding. My opponent does not show that that was a lie with any evidence. And finally, TA positions are awarded to students in the early rather than late stages of their graduate program. And Knoll was in the late stage. Again, nothing to show that that was a lie. He must show pretext. He must establish pretext that the defendants were not lying. Not merely that their decision was inaccurate or unfair. And he has failed to produce evidence showing that a reasonable jury could conclude that defendants were lying about these reasons given for not awarding him a TA position in that academic year. Again, with regard to the retaliation claim, it's our position that that can be easily resolved by a lack of causation as to a lack of knowledge about Mr. Knoll's complaints about disability discrimination. If there are any other questions, I'm happy to answer. Otherwise, I can waive my time. Okay. Very well. Thank you, Mr. Kilpatrick. Mr. Henderson, you've got a couple, two and a half minutes for rebuttal. Thank you, Your Honor. I think a good place to start would be the pretext argument that opposing counsel made. From the very beginning in this case, one of the things we have cited is that Dr. Vlach explicitly told Mr. Knoll after the extension was granted, this may prevent you from getting this TA position. If at that time the rest of these reasons were there, if already he was not going to get this TA position, that comment makes no sense. Why does she say it? What does it mean? Only if he is under consideration favorably for that position, even with the other things out there that opposing counsel mentioned, his previous history funding, previous TA positions, et cetera. Only if he is still under consideration does that comment make sense. And I think that leads to one other thing that's important to discuss here, and it's similar actually to a case this court decided called Silk, in which the plaintiff ultimately had a panoply of things, many of which the court said, we don't know. We may reject those, but it remanded the case off summary judgment based actually down to essentially one disputed statement. And it was a statement in which superiors of a professor within a department said, you know what, yeah, we didn't assign you courses. We didn't allow you to teach one semester because we thought you wouldn't be physically able to do them. I believe that's analogous to the situation here. In Silk, they did not mention we don't have, we have a problem because of this particular disability, but because of the impact of that disability. That's exactly the situation we have here. What the department, various folks say from Blatch, ultimately Brown, is not we have a problem because this is your disability, but rather we have a problem now because we think your disability, the thing connected to it, that is request for more time, makes you now not able to complete this program in a timely fashion. In other words, we now doubt your ability to do what we've been saying for years, we believe you can do. Opposing counsel said, I think, something to the effect of there is no evidence that there is any perception that Mr. Knoll would continue in the program outside of the admissions of Dr. Rosengren. Part of that evidence, though, that is very much there, that the district court disregarded, is the evidence of performance reviews and grades that entire time in which Knoll displayed Marx as an A student and in which he was declared to be making satisfactory progress as a PhD student. That's what changed. Thank you, Your Honor. Okay. Very well. Thank you, Mr. Henderson. We'll take the appeal under the, under advisement. And we'll move to our fourth.